IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE FRAIN GROUP, INC., | ) | |
| | ) | |
| *Plaintiff/Counterclaim-Defendant*, | ) | No. 14 C 7097 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| STEVE'S FROZEN CHILLERS, INC., | ) | |
| | ) | |
| *Defendant/Counterclaim-Plaintiff*. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Frain Group, Inc. ("Frain") filed suit against Steve's Frozen Chillers, Inc. ("Steve's") seeking a declaratory judgment that the contract entered into by the parties for the purchase and maintenance of a liquid packaging machine was valid and enforceable. Frain also alleged common law claims of defamation and tortious interference with business. (Dkt. 1, ¶¶ 30-35, 36-38.)[1] Steve's responded by filing a Counterclaim against Frain alleging a number of violations of which only the breach of contract (Count I) and the violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count II) remain. (Dkt. 14, ¶¶ 27-39.)[2] Both parties move for summary judgment on the remaining counterclaims: Frain for the breach of contract and the ICFA claims (Dkt. 86, 1-3) and Steve's on the ICFA claim (Dkt. 89, 1-3).

For the reasons set forth below, the Court denies both parties' motions for summary judgment. (Dkt. 86; Dkt. 89.)

**FACTS**

The following facts are undisputed unless otherwise indicated.

---

[1] None of the claims raised in Frain's original Complaint remain. The Court dismissed Count III (Dkt. 35) and the parties stipulated to dismissal of Counts I and II (Dkt. 45).
[2] The Court dismissed Count II (Dkt. 35).

1

Steve's, a Florida corporation, produces frozen beverage mixes. (Pl. SOF ¶5.)[3] Frain, an Illinois corporation, "retool[s], sell[s], and service[s] pre-owned packaging equipment throughout the United States." (Pl. SOF ¶¶ 1–2.)

In March 2014, Frain presented Steve's with a "Proposal for Engineered Services" ("Proposal") providing that Frain would sell Steve's a quality "Prodo-Pak Form & Fill" packaging machine ("Machine").[4] (Def. SOF ¶ 7.) The Proposal also provided that Frain would service the Machine. (*Id.*) Specifically, the Proposal stated:

> With every Engineered Services product, the Frain Group sets your machine to size and places your machine in Good Working Condition by:
>
> a. Thoroughly inspecting your equipment mechanically, electronically and pneumatically;
> b. Repairing and replacing worn, damaged, or missing components;
> c. Improving appearance by cleaning, painting and repolishing;
> d. Engineering, designing and fabricating the appropriate change parts to run your specific product;
> e. Adjust [sic] our machine to your specific requirements . . .

(*Id.* ¶ 10.) The Proposal also informed Steve's that Frain would provide training for operators at Steve's facility. (Pl. SOAF ¶ 2.) Additionally, the Proposal provided specifications regarding the Machine's components (without specifying that they are "Prodo-Pak components") (*see* Dkt. 93-1 at 5),[5] and indicated that the Machine will fill and seal 180 to 210 pouches with 3.6 ounces of fruit juice per minute. (*Id.* at 6.)

---

[3] The Court uses the following abbreviations to refer to the parties' filings in the Facts section: "Pl. SOF" refers to Dkt. 87, Frain's Local Rule 56.1 Statement of Facts; "Pl. Resp." refers to Dkt. 93, Frain's response to Steve's Statement of Facts; "Pl. SOAF" refers to Dkt. 93, Frain's Statement of Additional Facts; "Def. SOF" refers to Dkt. 90, Steve's Statement of Facts; "Def. Resp." refers to Dkt. 95, Steve's response to Frain's Statement of Facts.
[4] Steve's CEO specifically sought out a Prodo-Pak Machine because he believed Prodo-Pak made high quality products. (Def. SOF ¶ 6.)
[5] The Proposal included the following product specifications (punctuation errors taken from the Proposal):
- Prodo Pak Model PV215-60-CSW-10, automatic, 6 up, 4-sided, stainless steel, vertical form fill and seal machine rated from 10 to 50 [cycles per minute] with number of pouches – depending on materials.
- Package size: up to 19" in Width and up to 18" in Length. Fill range: from ounces to gallons with proper charge parts.

2

Between March and May 2014, the parties negotiated the purchase of the Machine (*id.* ¶ 11) and, on May 23, 2014, Steve Schoenberg from Steve's signed a contract ("the Agreement") to purchase the Machine. (Dkt. 93-2.) Steve's purchased the Machine for $254,204, which included an expediting fee of $20,000. (*Id.* ¶ 12; Dkt. 91 at 11.) The Agreement indicated that the Machine is a "Prodo Pak [] Form & Fill" and that Frain would conduct a "reconditioning and retooling project" on the Machine before delivery. (Dkt. 93-2 at 2.) The Agreement also included a warranty, which stated in part:

> Seller hereby warrants any components refurbished by Seller will be free from material defects for a period of 180 days from the date of machine acceptance at the Seller's facility (the "Warranty Period"). In the event of a valid warranty claim, Seller shall have the option either to repair the defective component or provide Buyer with a replacement component as Seller's expense.

(Dkt. 93-2 at 9.) The Agreement in bold print disclaimed all other warranties (*id.*) and declared that any descriptions made "pertaining to machine capabilities contained on [Frain's] invoice, website or in any other manner except as contained in Seller's Project Acceptance Letter are descriptive only and are not a warranty or guaranty of performance by [Frain.]"[6] (*Id.*) The Agreement also included a 14-day unconditional right of return (*id.*) and declared that Frain "shall not be liable for, and [Steve's] waives any claim for, incidental or consequential damages..." (*Id.* at 10.) Similar to the Proposal, the Agreement stipulated that the Machine "will

---

- Equipped with dual stainless steel product hoppers, both have lift off covers, level detectors,
- 2) sets of (3) 6" L x 1/2" ID pistons, 48" long side film rollers with 43" maximum web width and 20" maximum OD on 3" ID core with film registration,
- 19-1/2" horizontal hot knife seal jaw with tear notch and 6" vertical side seal jaws, static brush bar, slitter knives, stripper assay and discharge chute.
- Control panel has touch screen with swing arm and hand held controller with start, stop, jog and pump switches, front / rear vertical / horizontal heat
- 3/60/220V, 40 Amps, Air: 80 Psi

(Dkt.87-3 at 4.)

[6] The Project Acceptance Letter is a part of the Agreement. (Dkt. 93-2 at 11.) Thus, the Court refers to the Project Acceptance Letter as the Agreement.

be set up to automatically form 6 pouches, fill 3.6 oz. of fruit juice per pouch and seal at 30 cycles per minute." (*Id.* at 3.)

On June 27, 2014, Steve's president, David Schoenberg, completed and signed a "Packaging Equipment Check-Out Sheet" on which he indicated that the Machine ran to his satisfaction at the Factory Acceptance Test, that he would like a service technician to assist with start-up and training, and that he accepted the Machine and released it for shipment. (Pl. SOF ¶ 25; Dkt. 87-7 at 1.) On June 30, the Machine arrived, as designated, at the Lancaster Fine Foods ("LFF") facility in Lancaster, Pennsylvania.[7] (Def. SOF ¶ 18.)

Upon the Machine's arrival at the LFF facility, agents or employees of Steve's and LFF unpacked and set up most of the Machine. (Def. Resp. ¶ 28.) Then, a Frain technician, Jadran Radujkovic ("Radujkovic"), arrived to complete the installation and set-up, and to train LFF employees on how to use the Machine. (*Id.* ¶ 29.) When the employees at LFF began using the Machine independently, they could not get it to run consistently for "long periods of time." (Dkt. 90-4 at 20:22–24.) The Machine ran for various lengths of time. The service report from Radujkovic's July 10 visit to the LFF facility indicated that the Machine only ran for a few minutes in the morning before the hopper overflowed. (Dkt. 93-11 at 21.) Later that day, it ran for about an hour until the facility ran out of product. (*Id.*) The same day, the Machine had a "massive overflow" after running for a short period while Radujkovic was on a break. (*Id.*) On Dale Hammersmith's ("Hammersmith") service visit, he arrived to find "signs of hopper overflow" and "product film everywhere." (*Id.* at 23.) His service report indicated that he needed to instruct the day shift mechanic at the site because the mechanic "did not know how to put film thru [sic] Machine." (*Id.*) The report also indicated, however, that Hammersmith

---

[7] Steve's and LFF had an agreement that made LFF a co-packer of Steve's product using the Machine at LFF's facility. (Def. SOF ¶ 19.)

4

needed to replace "bad" parts, including "O-rings" and "slitter knives." (*Id.*) "O-rings," however, need replacing frequently (Dkt. 93-9 at 51: 2–13), so the fact that those parts went bad is not necessarily indicative of a poorly made Machine.

At Steve's request, Frain sent three different technicians on several occasions in July 2014 to inspect and service the Machine.[8] (Pl. Resp. ¶ 21.) The Machine was never consistently operational. (Def. SOF ¶ 21.) Frain claims, however, that the Machine was always capable of operating properly, but that operator error on the part of Steve's and LFF's employees caused the Machine to stop functioning. (*Id.* ¶ 23.) Affidavits, service reports, and deposition testimony from Frain technicians support the notion that the Machine's problems were at least partly due to operator error and inexperience. (*See* Dkt. 93-8; Dkt. 93-9 at 32–47; Dkt. 93-11.)[9] The CEO of Steve's stated in his deposition that the Machine repeatedly overflowed and that Frain's technicians consistently blamed that problem on inexperienced operators. (Dkt. 87-14 at 38:13–21.)

After the last Frain technician left on July 17, 2014, Frain refused to send further technicians free of charge because it determined that there was nothing wrong with the Machine. (Pl. Resp. ¶ 22.) Instead, Frain offered to send a technician to do additional training for a fee. (*Id.*) On July 30, Steve's threatened legal action, leading Frain to file this lawsuit. (Dkt. 93-13 at 2–4.)

Steve's has since hired third parties, including technicians from Prodo-Pak, to examine and repair the Machine. (Pl. SOF ¶ 46.) Prior to that examination, Steve's CEO believed his

---

[8] Radujkovic came on July 3, July 10, and July 17 (Dkt. 93-11 at 7, 32), Hammersmith came from July 9 to July 11 (*id.* at 23), and Larry Peters ("Peters") came from July 10 to July 11 and on July 17. (*Id.* at 19, 33.)
[9] For example, Radujkovic explained in his deposition that Machine operators at LFF had in place a system whereby they would yell to each other from opposite sides of the Machine regarding how much product to feed into the Machine. Radujkovic believes that this system was ineffective and caused overflow problems. (Dkt. 93-9 at 39–40.) Larry Peters confirms that this system led to product overflow and that Steve's did not follow Frain's recommendation to install an overflow-prevention mechanism. (Dkt. 93-8 at 5.)

company purchased a "used refurbished working, Prodo Pak machine." (Dkt. 87-14 at 19:18–19.) Steve's later learned from the Prodo-Pak technicians and the President of Prodo-Pak, who inspected the Machine, that Frain did not use original Prodo-Pak parts for several component parts of the Machine. (Def. SOF ¶ 27.) Frain, itself, fashioned at least some of the components. (Pl. Resp. ¶ 27.) According to Steve's and the President of Prodo-Pak, Frain manufactured low-quality components, which caused the Machine to malfunction. (Def. SOF ¶ 29; Dkt. 90-1, Ex. A.) According to Frain and its shop manager, all Frain-manufactured components functioned as intended and were of equal or better quality than any Prodo-Pak component. (Pl. Resp. ¶ 29.) Before the Factory Acceptance Test, Frain placed a Prodo-Pak sticker on the Machine, but the sticker was not from Prodo-Pak. (*Id.* ¶ 28.) The President of Prodo-Pak indicated that the sticker is "not even real" (Dkt. 87-14 at 40:13–14), while also acknowledging that the Machine had some Prodo-Pak components. (Dkt. 95-1 at 2.)

## **LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Black Earth Meat Market v. Village of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016.) An issue of material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015.) On cross-motions for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the party against which the motion under consideration was brought. *Nat'l Am. Ins. Co. v. Artisan and Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015).

**DISCUSSION**

The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Illinois law applies in this case because this Court sits in Illinois and because the parties agree that Illinois law applies. *See Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) (quoting *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991) ("'the federal court simply applies the law of the state in which the federal court sits . . . Courts do not worry about conflict of laws unless the parties disagree on which state's law applies'"); *Moser v. Universal Eng'g Corp.*, 11 F.3d 720, 724 n.6 (7th Cir. 1993) ("A federal court hearing a case under diversity jurisdiction will apply the substantive law of the state in which it sits."). Moreover, the Agreement specifies that the "Terms and Conditions of Sale . . . shall be construed in accordance with the laws of the State of Illinois." (Dkt. 93-2, at 10.)

Frain moves for summary judgment on the breach of contract claim, arguing that Steve's cannot point to any provision in the Agreement that Frain violated, and that Steve's failed to exhaust its exclusive remedies under the Agreement. Steve's moves for summary judgment on the ICFA claim, arguing that Frain violated the ICFA by deceptively providing Steve's with a Machine labeled as a Prodo-Pak machine when it was in fact a low-quality aftermarket machine and that Frain intended Steve's to rely on that deception so Steve's would purchase the Machine. Frain cross-moves for summary judgment on the ICFA claim, arguing that the Machine was of equal or better quality than any Prodo-Pak machine and that Frain was clear that it was providing Steve's a refurbished machine, such that no deception was possible.

As outlined below, there remains a genuine dispute of material fact that prevents the Court from entering summary judgment on either count.

7

## A. Breach of Contract

To establish a claim for breach of contract under Illinois law, a plaintiff must demonstrate the existence of a valid and enforceable contract, performance of the contract by the plaintiff, breach of the contract by the defendant, and a resulting injury to the plaintiff. *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, 36 N.E.3d 892, 910–11 (Ill. App. Ct. 2015). In the instant action, it is undisputed that the parties had a valid and enforceable contract and that Steve's fully performed its obligation under the contract—namely, to pay for the Machine. Thus, the only remaining question is whether Frain breached the Agreement, and if so, whether that breach resulted in an injury to Steve's.

The failure to perform fully a contractual duty when it is due is a breach of contract. Restatement (Second) of Contracts § 235 (Am. Law Inst. 1981); *see, e.g., Mydlach v. DaimlerChrysler Corp.*, 226 Ill.2d 307, 322, 875 N.E.2d 1047, 1059 (2007) (claim for breach of an express warranty actionable not upon tender of product, but only once warranty-related issues occur). In a two-party contract situation, when a promisor's duty to perform is absolute, the promisee's breach will not excuse performance of that duty, and the promisor has an independent claim against the promisee in damages. *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 467 (1960). As with all cases at the summary judgment stage, courts construing contracts in the context of sales between merchants decline to enter summary judgment where there are disputes of material fact as to whether a party actually breached. *See, e.g. Koursa, Inc. v. manroland, Inc.*, 971 F.Supp.2d 765 (N.D. Ill. 2013) (denying summary judgment where there was a genuine dispute of fact about the state in which a printing press arrived at the buyer's factory and where the contract for the sale of said printing press indicated the state in which the seller was meant to deliver it); *S.A.M. Elec., Inc. v. Osaraprasop*, 39 F.Supp.2d 1074 (N.D. Ill. 1999) (denying

summary judgment on a breach of contract count where there was a dispute of fact about whether the buyer seasonably informed the seller of defective goods received within the timeframe set forth in the contract).

Steve's identifies three ways by which it claims Frain breached. In its Counterclaim, Steve's first argues that Frain both breached the contract by delivering a machine that did not fit the description in the Agreement, and by failing to send qualified technicians to repair the Machine. (Dkt. 14, ¶¶ 30–31.) Steve's sets out a third theory for breach of contract in its response, namely, that Frain breached by refusing to send additional technicians free of charge after it had already sent three.[10] (Dkt. 94, at 4–5.)

Frain now moves for summary judgment arguing that, as a matter of law, it did not breach the Agreement because the Agreement is unambiguous, Steve's failed to identify a contractual provision that it violated, and because Steve's failed to invoke any of the exclusive remedies set forth in the Agreement. (Dkt. 89, at 8-10.) Steve's responds that Frain is not entitled to judgment as a matter of law because there is a dispute of material fact as to whether the Machine was of lesser quality or had different specifications than what the Agreement set forth. (Dkt. 94, at 4.) Steve's also claims that the Counterclaim, filed within the 180-day warranty period, constitutes a written claim against the warranty. Because only Frain moved for summary judgment on this count, the Court views all facts relevant to this claim in the light most favorable to Steve's.

With respect to Steve's first breach theory, there is no genuine dispute that Frain sent qualified technicians to service the Machine. On three occasions, Frain sent technicians (Peters,

---

[10] This theory first arose in Steve's Response to Frain's Motion for Summary Judgment. Even though Steve's failed to set forth this theory in its Counterclaim, the Court will entertain it. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743 (7th Cir. 2015) (parties are able to refine their theories of liability at the summary judgment stage based on evidence produced in discovery).

Hammersmith, and Radujkovic), all of whom have experience working with this sort of machine. (Dkt. 93-8; Dkt. 93-10; Dkt. 93-9.) Steve's allegation that these technicians were not qualified is a conclusory allegation that is unsupported by any evidence in the record. (*See* Dkt. 14, ¶¶ 21-22, 31-32.) In fact, Steve's briefs on this motion provide only a passing reference about Frain technicians as they relate to any theory of liability. (*See* Dkt. 94, at 5-6.) Steve's failure to develop this argument serves as a waiver for purpose of this motion. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (failure to develop an argument constitutes waiver). Thus, if Frain breached the contract, it did not do so for failure to send qualified technicians.

Second, as to whether the Machine functioned properly and according to specifications in the Proposal and the Agreement, each side presents affidavits from individuals that are familiar with this type of machine, and these individuals reach opposite conclusions. This creates a genuine dispute of material fact. Steve's submitted an affidavit by John Mueller ("Mueller"), the President and CEO of Prodo-Pak, who concluded that the Machine was defective in many ways, including: 1) improperly sized components fashioned by Frain made from lower quality material; 2) the Machine's failure to dispense product but for a few minutes before becoming non-operational; 3) when operating, the Machine's fill tubes dripped; 4) the Machine lacked necessary components known as "O-rings;" 5) the pressure regulator controls were mislabeled; and 6) the Machine used an outdated computer system. (Dkt. 95-1.) Frain, by contrast, submitted an affidavit from Technician Peters who concluded the Machine functioned properly, and that it was refurbished in accordance with all of the original manufacturer's specifications. (Dkt. 93-8.) According to Peters, the Machine was in perfect working condition during the Factory Acceptance Test and during his service visit to LFF. (*Id.*)[11] He claims that operator

---

[11] The following quotes from Peters' affidavit indicate his complete disagreement with all of Mueller's conclusions about the Machine:

error accounted for any and all issues that Steve's had with the Machine.[12] These affiants' conclusions are both plausible, but they are mutually exclusive. If Peters more accurately describes the nature of the Machine's problems, then Frain did not breach the contract by selling this Machine. If Mueller's conclusions that low quality parts caused operational issues are more accurate, then Frain breached because the Agreement specifies that the Machine would be capable of filling thirty cycles of six pouches every minute, and it frequently did not do that.[13] In either case, determining which affiant is more credible and which most convincingly describes why Steve's had issues with the Machine are jury functions. *See Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012) ("the court does not make credibility determinations or weigh the evidence," and the court can "disregard testimony only if reasonable persons could not believe it because it contradicts indisputable physical facts") (internal quotations omitted).

Similarly, whether Frain's refusal to send additional technicians free of charge was a violation of the 180-day warranty also depends on whether the Machine did not meet the Agreement's specifications and whether user error affected its operation. If it is the latter, then Frain's decision not to send additional technicians did not constitute breach because the Agreement only warrants that "components refurbished by [Frain] will be free from material defects." It logically follows that Steve's user error cannot qualify as falling within the limited warranty because employee use is neither a "component refurbished" by Frain, nor is such use

---

        20. No part or component of the Machine was defective.
        21. The parts that Frain engineers, designs, and fabricates in its machine shop are virtually identical to the original Prodo Pak parts and, in some instances, made of superior materials more suitable for the type of product Steves [sic] was using.
        22. None of the parts that were not manufactured by Prodo Pak were inferior in quality to Prodo Pak parts.
(Dkt. 93-8, at 4.)

[12] "The problem that Steves [sic] and LFF experienced with the Machine resulted from the faulty operation and maintenance of the Machine…" (*Id.* at 4.)

[13] The record is void of any reference as to how long, on a daily basis, Steve's planned on running the Machine. However based on the fact that they ran out of product after running the Machine for one hour, it is safe to say they did not plan on running the Machine 24 hours per day. (Dkt. 93-11, at 21.)

within Frain's ability to control. If it is the former, then Frain's decision constitutes a failure to comply with its agreement to cure material defects within 180 days. Due to the disputed evidence in the record regarding the cause of the Machine's malfunctioning, the Court cannot conclude that Frain's refusal to send additional technicians constitutes breach as a matter of law.

Finally, Frain argues that Steve's fails to allege a breach of any specific provision of what they consider an "undisputed and unambiguous" contract. (Dkt. 94, at 8-9.) When the contract language is unambiguous, the Court will look no further than the document itself to ascertain the intent of the parties. *McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 727 (7th Cir. 1996); *see also Lease Mgmt. Equip. Corp. v. DFO Partnership*, 392 Ill. App.3d 678, 685, 910 N.E.2d 709, 715 (Ill. App. Ct. 2009) (reaffirming use of the contract itself to interpret an unambiguous contract, as opposed to extrinsic evidence). Here, a genuine dispute of material fact exists. Steve's submits that this Counterclaim, filed within 180 days of the Agreement constitutes a "written warranty claim." (Dkt. 94, at 5.) Additionally, they cite to factual disputes over whether previously-sent written requests to Frain regarding parts of the Machine that were not working qualify as in-writing warranty claims. (*Id.*) In contrast, Frain argues that the Agreement specifically required "invoc[ation of] a claim under the 180-day warranty. (*See* Dkt. 92-2.) As such, Frain's claim that Steve's failed to seek one of the remedies enumerated in the Agreement (180-day warranty or 14-day right-of-return) is a question of fact that requires a jury determination. There are numerous examples where Steve's gave Frain written notice about issues of service and non-working parts. Furthermore, Steve's provides ample pursuable breach issues, for example the warranty section (Dkt. 93-2, at 9), Frain's statement in the Agreement that it offers the "highest quality of services available" (*id.* at 2), and the stipulation regarding how much output the Machine will produce. (*Id.* at 3.)

Accordingly, the Court denies Frain's Motion for Summary Judgment on the breach of contract count.

## B. ICFA Claim

Steve's argues that Frain deceived them into purchasing the Machine by falsely advertising it as a functioning Prodo-Pak machine made with quality Prodo-Pak parts when it was in fact "a Machine with low-quality, non-Prodo-Pak parts that never worked properly." (Dkt. 91, at 5.) Frain points out that the Agreement expressly bars any claims against Frain based on Steve's reliance on statements, such as representations in the Proposal, made outside the four corners of the Agreement. (Dkt. 88, at 11–13.) Frain further argues that any belief Steve's may have had that Frain refurbished machines using solely Prodo-Pak parts is "unbelievable" given Frain's express statements in its Proposal and on its website that it is in the business of reconditioning and retooling used Prodo-Pak machines. (Dkt. 96, at 10.)

In order to make out a claim under the ICFA, Steve's must demonstrate that Frain committed a deceptive or unfair act, with the intent that Steve's rely on that act, and that Frain committed the act during a course of conduct involving trade or commerce. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010). While Frain must intend to create Steve's reliance on a deceptive representation, Steve's need not prove that it actually relied on any deceptive representation in order for Frain to be liable. *See Gehrett v. Chrysler Corp.*, 379 Ill.App.3d 162, 175, 882 N.E.2d 1102, 1115 (Ill. App. Ct. 2008) ("the plaintiff need not prove that he relied on the deceptive act") (distinguished on other grounds by *Langendorf v. Conseco Senior Health Ins. Co.*, 590 F.Supp.2d 1020 (N.D. Ill. 2008); *see also Keeling v. Esurance Ins. Co.*, 660 F.3d 273, 275 (7th Cir. 2011). An unfair or deceptive act is one that both violates public policy, and is so oppressive that the consumer has little choice but to submit, or that causes substantial injury.

13

*Siegel*, 612 F.3d at 934. To prevail under the ICFA, Steve's must demonstrate that Frain's deceptive conduct is the proximate cause of such an injury. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2007); *see also Sabo v. Wellpet, LLC*, No. 16 C 8550, 2017 WL 1427057, at *3 (N.D. Ill. 2017) (consumers failed to demonstrate that the defendant's deceptive placement of a "Made in America" label on pet food that contained foreign ingredients caused consumers to pay a premium). If Steve's opted not to purchase the Machine but for Frain's deceptive representations, then Frain caused substantial injury such that it is liable under the ICFA. *See Rockford Memorial Hosp. v. Havrilesko*, 368 Ill.App.3d 115, 121, 858 N.E.2d 56, 62 (Ill. App. Ct. 2006) (explaining that deception under the ICFA exists where the consumer would have acted differently had it been aware of a material fact that the seller concealed); *see also Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (a deceptive act that proximately causes actual damage is sufficient under ICFA).

Whether the Court can enter summary judgment on the ICFA claim comes down to a single sticking point.[14] Steve's claims that Frain placed the recreated Prodo-Pak sticker on the Machine to induce Steve's into accepting the Machine at the Factory Acceptance Test.[15] Analysis of the most relevant case law indicates that placement of this recreated sticker qualifies

---

[14] Another possible deception is the Agreement's description of the Machine as a "Prodo-Pak Form & Fill." This, however, is clearly not a deceptive act because the Agreement also specifies that Frain would "retool" the Machine, indicating that Frain would add new parts to a Prodo-Pak machine. Retool means to "equip (a factory) with new or adapted tools." *Retool*, Oxford English Dictionary (2017), https://en.oxforddictionaries.com/definition/retool. All the evidence indicates that Steve's received a Machine that had Prodo-Pak components and that Frain did indeed retool the Machine prior to delivery.

[15] Steve's also alleges that fifteen other features of the Machine are different from, and inferior to, what Frain led it to expect through the Proposal, the Agreement, and the Factory Acceptance Test. (Dkt. 91, at 7–8.) However, Steve's fails to allege which clauses in the Proposal or Agreement led it to expect that the Machine would have certain specifications or operate in a particular fashion. For example, Steve's claims that the fact the Machine's O-Rings were made with Viton, not silicone rubber, was deceptive because Frain led Steve's to believe that they would be made with rubber. (Dkt 91, at 7.) However, Steve's fails to indicate what representation by Frain led it to expect that the Machine would have silicone rubber O-Rings. As a second example, Steve's claims that the "stopper rod ends were all supposed to be the same diameter in order to produce a consistent product." (*Id.*) Steve's fails to specify how it came to have that expectation about those components, and the Court has found nothing in the record indicating how the stopper rods were "supposed" to be made.

as a deceptive act under the ICFA. *See Gehrett*, 379 Ill.App.3d 162, 882 N.E.2d 1102 (upholding a jury determination that a car manufacturer deceived lessees under the ICFA by placing a high-end four-wheel drive symbol on the gear shift when the vehicle was in fact equipped with a different, less expensive four-wheel drive system); *Sabo*, 2017 WL 1427057 (N.D. Ill. 2017). Just as the labels in *Gehrett* and *Sabo* qualified as deception under the ICFA, so too does the placement of this Prodo-Pak sticker that did not come from Prodo-Pak.

With respect to the second element, Frain's intent that Steve's rely on the placement of the sticker, it is difficult to imagine that Frain meant this sticker to serve any other purpose. Common sense indicates that Frain placed this sticker on the Machine to make the Machine look more authentic, thereby inducing Steve's to purchase it. And there is no dispute that the third element is satisfied, as this representation took place in the course of commerce between the two parties.

The final question is whether Steve's suffered a substantial injury proximately caused by Frain's deception. Steve's claims that Frain's deception injured Steve's by inducing it to spend hundreds of thousands of dollars on a machine that it expected to function and instead had to pay third parties to fix the Machine. Here, there is evidence that Steve's sought out a Prodo-Pak machine because Steve's believed that Prodo-Pak produced the highest quality machines on the market. Because Steve's specifically sought out a Prodo-Pak, it is therefore plausible that the placement of this sticker assured Steve's that it was getting the type of Machine it wanted. As such, Steve's has sufficiently pled and supported its ICFA claim such that it survives Frain's motion for summary judgment. *See Wiegel v. Stork Craft Mfg., Inc.*, 780 F.Supp.2d 691 (N.D. Ill. 2011) (denying the defendant's motion for summary judgment on an ICFA claim where the plaintiff purchased one of the defendant's cribs after reading the defendant's deceptive

representations regarding the crib's safety features). Although Steve's does not present evidence that the sticker specifically deceived it into accepting the Machine, it is likely that the sticker reassured Steve's at the Factory Acceptance Test that it was getting the product for which it had bargained. Given the requirement that courts construe the ICFA liberally so as to effectuate its purpose - protecting those engaged in commerce (*see Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F.Supp.2d 898, 909 (N.D. Ill. 2012)), the Court makes the reasonable assumption that Steve's chose to accept this Machine in part due to the placement of this sticker. That being said, while this is sufficient to establish that Frain's deception contributed to Steve's purchase of the Machine, it is not enough to conclude that Steve's decision to purchase the Machine actually caused an injury. Whether the deception actually injured Steve's brings us back to the discussion about what caused the Machine to malfunction. Given the factual dispute on that question, the Court cannot conclude that Frain actually injured Steve's by placing that sticker on the Machine. If the Machine functioned just as well as a Prodo-Pak, and the only problem with the Machine was operator error, then Frain's deception did not cause any injury. If, however, the Machine functioned worse than a Prodo-Pak machine would have with same operators, then Steve's did suffer an injury such that a reasonable jury could find liability on this count.

  Accordingly, the Court denies both motions for summary judgment on the ICFA count.

## **CONCLUSION**

For the foregoing reasons, the Court denies the cross-motions for summary judgment (Dkt. 86; Dkt. 89.)

_____
Hon. Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 14, 2017