## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE FRAIN GROUP, INC.,
an Illinois corporation,

     *Plaintiff/Counter-Defendant,*

     v.

STEVE'S FROZEN CHILLERS,
INC., a Florida corporation,

     *Defendant/Counter-Plaintiff.*

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 14 C 7097

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendant The Frain Group, Inc. ("Frain") sold Defend-ant/Counter-Plaintiff Steve's Frozen Chiller's, Inc. ("Steve's") a packaging machine that it could use to make frozen juice popsicles. The machine malfunctioned and Steve's lost a deal to supply the freezer pops to schools throughout New York City. Steve's demanded that Frain pay damages allegedly related to the sale and purchase of the machine. Frain filed this suit in response, seeking among other things enforce-ment of the parties' agreement (Dkt. 1) and Steve's filed counterclaims alleging breach of contract, breach of implied warranties, and consumer fraud. (Dkt. 14.) Cer-tain of the parties' claims have been dismissed, either by the Court or by agreement of the parties. In April 2018, the Court held a bench trial on the only remaining claims: Steve's counterclaims for breach of contract and for statutory fraud. In July 2018, the parties submitted proposed findings of facts and conclusions of law. (Dkts. 152, 153.) After reviewing all of the evidence and judging the credibility of the

witnesses, the Court enters judgment for Frain because Steve's failed to prove its counterclaims by a preponderance of the evidence.

## PROCEDURAL HISTORY

Frain initiated this suit by filing a Complaint seeking declaratory judgment (Count I) that the parties' agreement is valid and enforceable. (Dkt. 1.) The Complaint also alleged claims for defamation by libel (Count II), and tortious interference with prospective business relationships (Count III) against Steve's. (*Id.*) The Court dismissed Count III with prejudice (Dkt. 35) and the parties stipulated to the dismissal of Counts I and II with prejudice, pursuant to settlement. (Dkt. 46.)

Steve's filed counterclaims alleging breach of contract (Counterclaim I), a violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 ILCS 505/2, et seq. (Counterclaim II), and breach of implied warranties (Counterclaim III). (Dkt. 14.) The Court dismissed Steve's counterclaim for breach of implied warranties (Counterclaim III) with prejudice. (Dkt. 35.) Both parties moved for summary judgment on the sole remaining counterclaims: Frain for the breach of contract and ICFA claims (Dkt. 86), and Steve's on the ICFA claim (Dkt. 89.) The Court denied both motions.

With respect to the breach of contract claim, the Court held that genuine issues of material fact existed as to whether (1) the machine functioned properly and was refurbished according to all of the required specifications such that any operation issues were caused by user error (as Frain's argued) or (2) whether Frain used low-quality parts that caused the operation issues (as Steve's argued). With respect to the

ICFA claim, the Court held similarly that a genuine issue of material fact existed as to what caused the machine to malfunction—the use of lower-quality parts than are in a Prodo Pak machine or operator error—and, therefore, whether Steve's suffered a substantial injury proximately caused by the alleged deception. (*Id.* at 13–15.)

The Court held a multi-day bench trial on these two remaining claims. (*See* Dkt. 143–46.) Steve's called the following witnesses to testify at trial: Steven and David Schoenberg, the father and son co-founders of Steve's; John Mueller, President and CEO of Prodo-Pak, manufacturer of packaging machines like the one Steve's purchased from Frain; John Frain, Vice President of Operations for Frain; Dale Hammersmith, Director of Field Services of Frain; Jadran Radujkovic, an experienced electrician and programmer for Frain; and Mico Budic and Larry Peters, shop managers for Steve's responsible for selecting and refurbishing machines for sale.

The Schoenbergs testified about how they started Steve's together as a "family business" around the time that David (the son) was finishing college (Trial Tr. vol. 1-A, 44:8–11), how Steve (the father) and his wife landed a "big" deal with New York City schools at the end of 2013 (Trial Tr. vol. 1-A, 46:5–47:6), and about their subsequent search for a machine that they could use to fulfill the orders on the NYC schools deal—including how they ultimately decided to purchase a refurbished machine from Frain after realizing that they did not have time to order a new machine if they wanted to make the NYC schools' deadline. (Trial Tr. vol. 1-A, 47:7–15.) Michael Alleva, who represented Steve's in pitching its products to the NYC schools (Trial Tr. vol. 2-A, 260:19–261:17), also testified about the details of the NYC schools' deal and

the tight deadlines Steve's faced to fulfill those purchase orders. (*Id.* at 264:22–265:13.) The Schoenbergs, as well as John Frain, provided testimony about the parties' negotiations, the agreed-to contract terms, and Steve's version of events regarding the subsequent set up, overflow, and servicing of the machine.

Several witnesses testified about the functionality of the refurbished machine after Steve's purchased it. Hammersmith and Radujkovic both testified about the services and training provided by Frain to Steve's after it purchased the machine. Both also testified that when Radujkovic arrived for the first service call, the machine had already been started up and was covered in juice product due to a "major spill" caused by Steve's failure to connect the proper controls. (*See, e.g.,* Trial Tr. vol. 2-A, 404:7–407:6.) Frain's service report indicated the machine was soaked with liquid product. (Trial Tr. vol. 4-A, 543:20–544:11). Despite being confronted with this report at trial, David Schoenberg—who was present for the unloading and installation of the machine—maintained that he specifically instructed the individuals installing the machine not to start it until the Frain technician arrived and that they "definitely" did as told. (Trial Tr. vol. 2-A, 329:11–20, 355:9–16.)

Mueller, President and CEO of Prodo-Pak, examined the used machine at Steve Schoenberg's request. (Trial Tr. vol. 1-A, 144–184.) At trial, Mueller testified about how Prodo-Pak's vertical form, fill and seal machines—the type of machine purchased by Steve's—operates when all components are functioning properly (Trial Tr. vol. 1-A, 134:17–143:4), and described the functional issues he observed when working on Steve's machine. (Trial Tr. vol. 1-A, 183:9–184:3, 193:12–13.) He

admitted, however, that he had no knowledge of who installed the machine or whether the machine had functioned properly before he examined it. (*Id.*)

Following trial, in July 2018, the parties submitted proposed findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. (Dkt. 152–53.)

## FINDINGS OF FACT

Steve Schoenberg and his son David started Steve's in 2001. (Trial Tr. vol. 1-A, 44:11, Apr. 16, 2018, Dkt. 147.) Originally, the family business purchased frozen drink machines and then loaned them out to various vendors. (*Id.* at 44:14–17.) In return, the vendors bought the mixers for the machines from Steve's. (*Id.* at 44:18.) Buying these machines turned expensive, so the Schoenbergs decided to start making the freezer pops themselves. (*Id.* at 44:23, 45:3.) Toward the end of 2013, Steve's started marketing its products to potential clients and eventually began negotiating with the City of New York to supply juice freezer pops for students in the New York City school system. (*Id.* at 45:6–10.) While the deal would be lucrative, it required Steve's to meet a tight summer 2014 deadline.

As negotiations became closer to a deal, Steve's began searching for a machine to manufacture the freezer pops that Steve's was claiming it could manufacture and provide to the schools. After receiving recommendations from folks inside the industry, Steve's eventually settled on a form, fill, and seal machine manufactured by Prodo-Pak. (*Id.* at 47:10–11.) In 2014, Steve's contacted Prodo-Pak in order to purchase a machine that could make the freezer pops, but because the first shipment of pops was to be delivered to the schools by July 2014 (Trial Tr. vol. 2-A, 263:6–8), the

representatives of Prodo-Pak said that they could not build a new machine in the short time period Steve's required to meet its deadline. (Trial Tr. vol. 1-A, 47:12–13.) So, Steve Schoenberg began searching for the machine on Google and noticed a Frain advertisement. (*Id.* at 47:14–15.) Schoenberg identified the machine as a Prodo-Pak because of its big logo in the middle. (*Id.* at 48:12–14.) Soon thereafter, Steve reached out to John Frain who told him that Frain was advertising a used Prodo-Pak machine. (*Id.* at 48:15–22.) Unlike Prodo-Pak, Frain was able to meet the expedited schedule, albeit for an additional $20,000 fee. (*Id.* at 52:15–17.) As a result, the parties entered contract negotiations.

## I.    The Prodo-Pak Machine

Frain reconditions and refurbishes manufacturing machines. These machines can be anywhere from five to forty-years-old. (Trial Tr. vol. 2-A, 305:2–12, Apr. 17, 2018, Dkt. 147.) Its inventory includes Prodo-Pak products. (*Id.* at 305:13–15.) Prodo-Pak originally manufactured the model that Frain sold to Steve's in 1997, making the machine that they had in their inventory at least 18-years-old at the time of purchase. (Trial Tr. vol. 1-B, 146:12–14, Apr. 16, 2018, Dkt. 147.) Prodo-Pak once retooled that machine itself in-between owners in the early 2000s. (*Id.* at 148:2–6.) Although the company knows this because it attaches identification plates to its machines (*id.* at 146:21–25), it does not place decals with its logo on them. (*Id.* at 157:19–24.)

Frain uses industry standard parts with comparable quality to the original equipment manufacturer when it is refurbishing a machine so that the parts in the refurbished machines are identical to what Prodo-Pak might initially use. (Trial Tr.

vol. 4-B, 635:7–13, Apr. 20, 2018, Dkt. 147.) Frain and Prodo-Pak purchase parts from the same suppliers. (Trial Tr. vol. 4-A, 593:10–11, Apr. 20, 2018, Dkt. 147.) For instance, Prodo-Pak itself buys roughly 50 percent of the parts on its machines from outside vendors. (Trial Tr. vol. 1-B, 178:7.) Some of those parts are made by suppliers while others are electrical components common to all these machines. (*Id.* at 178:12–22.) In fact, with this machine, Frain bought some of its parts from Prodo-Pak, including a knife and some switches. (Trial Tr. vol. 4-B, 635:17–21.)

## II.    The Contract

In March 2014, after Steve decided he wanted to purchase the machine advertised by Frain, Frain sent Steve's a Proposal for "quality pre-owned packaging and processing production equipment with associated set-to-size and retooling service" that included the exact Proto-Pak model and serial numbers of the machine. (Trial Tr. vol. 2-A, 287:8–21, 306:25, 307:1–2.) The proposal explained that Frain would "repair[] and replac[e] worn, damaged, or missing parts," "engineer[], design[] and fabricat[e] the appropriate change parts to run [Steve's] specific product," and "adjust [the] machine to [Steve's] specific requirements." (JX1 at 000002.)

In order for the machine to work manufacturing the freezer pops, Frain set up the machine according to Steve's design. In other words, Frain would be retrofitting the machine in its inventory to create the product that Steve's said it needed. (*Id.* at 310:7–14.) On May 23, 2014, Steve's executed a contract to purchase the machine for $219,875, plus an additional $20,000 expediting fee, $12,450 for a custom part, and $1,879 for crating, totaling $254,204. (JX2 at 000006.) Steve's also agreed to an

estimated quote of $12,950 for 60 hours of startup and training at its facility. (*Id.* at 000007.)

Consistent with the proposal, the contract executed by the parties made clear that the machine being purchased was a reconditioned—and not new—machine. (*Id.* at 308:18–21.) For example, the Contract included the following language:

**Project Overview**

. . . Thank you for the opportunity to present this proposal for your acceptance on your *reconditioning and retooling* project. The Frain Group specializes in the *reconditioning* of packaging equipment . . .

**Scope of Work**

. . .

- Inspect all mechanical components; *repair and replace* as necessary. . . .

- Pneumatic components will be tested and *repaired or replaced* as necessary. . . .

- All electrical components will be tested and *repaired or replaced* as necessary. . . .

(JX3A; JX3B (emphasis added).)

The contract also set forth specific obligations undertaken by each party regarding installation, start-up, and training. The contract required that Steve's install the machine; not Frain. (*See, e.g., id.* at 313:1–7 (stating "[m]achinery must be in place, removed from skid, and hooked to all utilities."); Trial Tr. vol. 1-A 84:22–24, vol. 2-A 286:2–8 (explaining that the "[b]uyer shall be solely responsible for ensuring that the equipment purchased from seller is installed and operated in a proper and safe manner."); Trial Tr. vol. 4-A, 533:2–3 (answering "[w]e never install the machine. That's [the] responsibility of [the] customer.").) Specifically, it required Steve's to

"physically install the machine, hook it to power, [and] air requirements," (Trial Tr. vol. 2-A, 312:12–13.; vol. 4-A, 538:17–19). Frain, in turn, was responsible for start-up and training. (Trial Tr. vol. 2-A, 312:14–24.) Essentially, Steve's job was to hook up the machine and Frain's role was to come in and check on it. (Trial Tr. vol. 4-A, 536:15–22.) For example, Steve's had to "run[ ] the power to the plug," but Frain had to "plug it in as part of the start-up procedure." (*Id.* at 538:20–22.)

Finally, the contract set forth specific provisions defining the scope of remedies available to Steve's. (*See* JX3F.) These remedies included a limited warranty and 14-day right of return. (*Id.*) The limited warranty provided a 180-day warranty on refurbished parts and, to the extent assignable, a manufacturer's warranty on all purchased parts, to the exclusion of all other warranties of any kind:

> **LIMITED WARRANTY,** Seller hereby warrants any components refurbished by Seller will be free from material defects for a period of 180 days from the date of machine acceptance at the Seller's facility (the "Warranty Period"). . . . To the extent assignable, Seller will assign Buyer all warranties on components purchased from third-party vendors (which warranties pay be shorter than Seller's 180- day warranty). . . . THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF AND SLLER HEREBY EXCLUDES ANY AND ALL WARRANTIES OF ANY NATURE OR KIND, WHETHER EXRESS OR IMPLIED . . .

(*Id.* at ¶ 1(b)). The 14-day right of return provided an unconditional right to return any equipment in the same condition as when it was sent to Steve's for a full refund:

> **14 DAY RIGHT OF RETURN.** Seller hereby provides Buyer with FRAIN INDUSTRIES's 14 day unconditional right of return. Buyer may return the Equipment to Seller within 14 days of delivery of the Equipment to Buyer, in the same condition as the Equipment was in when loaded on to Buyer's trailer, secured to the original skidding provided by Seller or if not skidded by Seller, then created, with costs of shipping prepaid by Buyer, for a full refund of the purchase price . . .Seller's 14

day right of return is in lieu of any Limited Warranty or other claim against Seller.

(*Id.*; *see also* Trial Tr. vol. 2-A, 310:18–22.) Frain also agreed to repair or replace any damaged or worn-out parts. (*Id.* at 276:6–12, 288:1–8.) Steve's never requested replacement parts under the warranty nor did it demand or tender the machine back under the 14-day no-questions-asked return policy. (*Id.* at 310:23–311:9; vol. 1-A, 90:1–13.)

## III.   The First Frain Visit and Factory Acceptance Test

Steve's hired Lancaster Fine Foods, a packaging plant, to operate the machine. On May 29, about six days after Steve's signed the agreement, David Schoenberg (the son of Steve and President of Steve's) and Mark Thompson (the owner-manager of Lancaster) visited the Frain facility to observe the machine. (Trial Tr. vol. 2-A, 314:10–21.) David Schoenberg is not an engineer and currently takes college classes (*id.* at 320:6–9), nor has he ever started up similar equipment. (*Id.* at 329:14–16.) Thompson, although the plant manager, did not have a similar machine at Lancaster. (*Id.* at 329:15–18.) He was unaware of the machine's operating requirements (Trial Tr. vol. 4-A, 591:4–5) and acknowledged that his company still had "more to learn" months later. (Trial Tr. vol. 1-B, 111:11–13.) The mechanics had no experience with this type of equipment and were not sufficiently skilled to maintain it. (Trial Tr. vol. 4-B, 655:16–657:4.) Even Lancaster's electricians had no applicable experience. (Trial Tr. vol. 3-A, 438:13–15, Apr. 18, 2018, Dkt. 147.) The Steve's representatives, unqualified as they may be, did not observe anything notable in this visit.

The contract provided for a factory acceptance test at Frain and then later training on site at Lancaster. (*Id.* at 288:9–23.) The purpose of the field test was "to demonstrate that the machine . . . met the scope of work that was originally agreed upon." (Trial Tr. vol. 1-B, 188:19–22.) Typically, mechanical engineers purchase the equipment and then attend the test. (*Id.* at 188:12–14.) Often, the plant personnel— those that will be responsible for running the machine once it is at the location—will be there, too. (*Id.* at 188:14–16.) Frain strongly advises that the highest-skilled mechanic, machine operator, floor supervisor, and maintenance supervisor be present. (Trial Tr. vol. 3-A, 402:12–18.)

Instead, David Schoenberg was the only person that came to witness the factory acceptance test on June 30. (*Id.* at 403:9–10.) Even though Frain requested Lancaster's best technician, that individual did not show up. (Trial Tr. vol. 2-B, 346:2–7, Apr. 17, 2018, Dkt. 147.)  It was at this time that David Schoenberg saw the sticker with the Prodo-Pak logo on the machine. (*Id.* at 315:14–24.) After talking with representatives of Frain, Schoenberg signed a form and accepted the machine. (*Id.* at 326:1–5.; vol. 3-A 403:11–16.) With the sale confirmed, Frain shipped the machine to Lancaster and it arrived around July 1. (Trial Tr. vol. 1-A, 52:18–23.) David Schoenberg, on behalf of the company, showed up at the facility around that same time. (*Id.* at 53:1–2.) This is when the "falling out" between Steve's and Lancaster began. (Trial Tr. vol. 2-B, 348:18–19.)

## IV. The Installation, Startup, and Training at Lancaster

When David Schoenberg got to Lancaster on or around July 1, the machine was still on the truck. (Trial Tr. vol. 1-A, 79:4–5.) He assisted the plant personnel in unloading and moving it into the plant. (Trial Tr. vol. 2-A, 328:20–24.) The machine was placed in a location where it was not able to be accessed on all four sides, which according to Frain's Dale Hammersmith, created a safety issue. (*Id.* at 390:2–4.) The Lancaster employees installed the actual machine and an outside contractor connected electric and air. (*Id.* at 329:3–10, 330:17–25, 354:1–4; vol. 4-B, 634:3–4.) Steve's relied on Lancaster to provide these utilities and the necessary wiring to the machine. (Trial Tr. vol. 2-A, 353:23–25.) Frain did participate in installation. (*Id.* at 403:23–404:1.)

A form, fill, and seal machine essentially takes rolls of plastic film, forms them into a pouch, fills the pouch with a product, and seals the pouch. (Trial Tr. vol. 1-B, 134:5–139:12.) Relevant here, a pump supplies the product to the hoppers on top, and those introduce the product into the machine for packaging. (*Id.*) Typically, level controls sense when the volume in the hopper gets too low, and they tell the pump to "send more product over to fill the hopper up again so that the process can be continuous and not interrupted." (*Id.* at 137:24–25.)

During the installation, Steve's and Lancaster did not install the level controls that controlled the flow of the frozen drink mix into the machine. (*Id.* at 377:13–14, 439:17.) The level controls utilize electricity to have the machine communicate with the pump and tell it when to run and not run the frozen drink mix into the machine.

(*Id.* at 407:16–23.) Frain told Steve's and Lancaster to hook up the controls. (Trial Tr. vol. 3-A, 455:14–20; vol. 3-B, 494:13–15, Apr. 18, 2018, Dkt. 147.) Instead, Steve's and Lancaster opted to use a manual system. (Trial Tr. vol. 3-A, 439:21–440:12.) Steve's never hooked up the level controls even though Steve's knew how important the level controls were to safe operation. (*Id.* at 386:1–387:19.) Because the level controls were never hooked up, the machine repeatedly overflowed when operated, and the spillage ultimately broke down the machine's mechanical and electrical components. (*Id.* at 377:15–17.)

Making matters worse, the contractors Steve's hired to install the pump (and the piping, valves, and hoses) could have just installed an electrical control on the pump and wired the level controls on the machine, but they did not do that. (*Id.* at 440:6–12, 441:11–16; vol. 4-A, 574:25–576:6.) Instead, Lancaster chose to have a person stand on top of the machine and yell to another person 60 feet away to tell that person when to start and stop the pump. (Trial Tr. vol. 2-B, 407:24–408:1, 496:4–7, 502:19–25.)

## A. Frain's First Service Call: July 3–7

Due to decisions to circumvent the usual procedures in place, Steve's had to make a number of service calls as soon as they began using the machine. The first of these calls occurred on July 3. (Trial Tr. vol. 2-B, 372:19–25.) Jadran Radujkovic was an experienced electrician and programmer of the Prodo-Pak machine at Frain, and upon receiving the first call for service, he was the one dispatched to Steve's. (*Id.* at 373:22–25; vol. 4-A, 611:2–9.) On July 3, he traveled to Lancaster to start the machine

and train the mechanics there the following day. (Trial Tr. vol. 2-B, 373:5–11.) When Radujkovic arrived, he noticed that prior to his arrival on July 4, someone had tracked the film onto the machine and tried starting it up. (*Id.* at 407:2–6.) He was aware of this because when he arrived that day, the machine was soaking wet (Trial Tr. vol. 4-A, 543:18–25), and there was a lot of film on the floor and in the garbage can. (*Id.* at 554:13–20.)

Schoenberg was there and told Radujkovic that they had tried to run the machine before he arrived because they were behind and did not have enough time to get the production done. (*Id.* at 547:1–2.) At this time, Steve's was under pressure to ship its first order of 300,000 units of freezer pops to New York for the month of July (Trial Tr. vol. 2-A, 265:1–7), so Steve's had decided to keep production moving despite the overflow spillage of juice. (Trial Tr. vol. 4-A, 547:1–9.) When he arrived, Radujkovic cleaned and recalibrated the machine so that by 11:00 p.m. it was running and producing product. (*Id.* at 546:14–16.)

The next day, July 5, the machine continued to struggle with overflow issues. (*Id.* at 547:13–14.) Radujkovic attempted to train the operators but it was difficult because Lancaster did not have any real technical or electrical support. (Trial Tr. vol. 2-B, 378:3; vol. 3-A, 442:15–16.) Although there were two technicians on staff, they were preoccupied with running the plant and not the Prodo-Pak machine. (*Id.* at 442:17–22.) Even without the operators present, the Frain staff struggled to gain access to the machine itself. (*Id.* at 444:20–25.) It would later appear to one Frain employee that Steve's had "no control" over Lancaster. (*Id.* at 458:9–11.) On that day

(July 5), for example, Radujkovic tried to train the operators, but Steve's kept changing the people to train and different people showed up on different days. (Trial Tr. vol. 4-A, 550:6–10.)

Schoenberg told Radujkovic not to come in to Lancaster on July 6, explaining that Radujkovic was too expensive, that he was okay with the machine performing as it did, and that everything was fine. (*Id.* at 560:9–17.) Despite that, Schoenberg called Radujkovic's hotel room at 1:00 a.m. on July 7, complaining again about problems with the machine. (*Id.* at 561:9–11.) Radujkovic left his hotel after this 1:00 a.m. call and went to Steve's to help fix the problem. (*Id.* at 561:13–24.) When Radujkovic arrived, he again observed the machine overflowing because the operators failed to track the film correctly. (Trial Tr. vol. 2-B, 422:1–14.)

### B.    Frain's Second Service Call: July 9–11

Radujkovic returned to Steve's two days later on July 9 with two of his colleagues at Frain: Dale Hammersmith and Larry Peters. (*Id.* at 564:4–10.) When they arrived, they again found a lot of film and signs of product overflow. (*Id.* at 564:10–11.) Radujkovic worked with the day shift mechanic who did not know how to put the film through the machine. (*Id.* at 566:6–7.) He explained that it was difficult to put the film through the machine because of his other responsibilities in the plant. (*Id.* at 566:9–11.) Every time Frain representatives visited the facility, Steve's was running full production and only staffing enough people to run their own machines. (*Id.* at 382:1–2.)

By this point, Radujkovic understood that Lancaster never connected the level controls and that Steve's was using a yelling system where one operator would shout to another operator standing 60 feet away to turn the pump on or off based on whether the machine was full of the drink mix. (Trial Tr. vol. 4-A, 544:10–11, 596:6–22.) Radujkovic told Steve's that from this point forward they could not run the machine like that. (*Id.* at 597:23–24.) Going against that advice, the operators removed the level controls and cover assembly completely and did not use them the way that Frain and Prodo-Pak intended them to be used. (*Id.* at 606:2–4.) The standing-and-yelling system introduced variability in the tracking of the film which eventually led back to the main symptom noticed on day one—product overflow. (Trial Tr. vol. 4-B, 657:19–23.) Notwithstanding the setbacks, Hammersmith said that the machine "was running well[,] [i]t was running excellent," when he, Radujkovic, and Peters left on July 9. (Trial Tr. vol. 2-B, 431:14.)

The next day, July 10, the product was still not ready for the New York schools contract and there was more overflow of juice at Lancaster. (Trial Tr. vol. 4-A, 578:2–8.) Radujkovic testified that there had been a big thunderstorm that led to a significant overnight flood in the factory. (*Id.* at 578:24–579:5.) The pump for the machine was in the middle of filling when the power went out. (Trial Tr. vol. 3-A, 450:5–6.) Everybody at Lancaster evacuated and when the power came back on, the pump turned back on, and when it did, emptying out gallons and gallons of product. (*Id.* at 450:6–10.) A pump like the one Frain recommended would have automatically shut off after a power loss and perhaps would have prevented the spill. (*Id.* at 440:10–12.)

But Lancaster used a manual pump and so the transfer of the product continued after the power came back on. (Trial Tr. vol. 4-A, 579:24–580:6.) This caused lasting damage to the machine. (*Id.* at 579:6–17.) The Frain team finished cleaning up and completed the order at 2:00 a.m. (*Id.* at 581:18–22.)

Returning on July 11, they dealt with many of the same issues, including improper film tracking. (*Id.* at 585:1–10.) By the time they left, however, the Frain team had the Prodo-Pak back in good running condition. (Trial Tr. vol. 3-A, 450:1–2.) The Frain representatives asked Lancaster to wire the level sensors before their return visit but Lancaster failed to do so. (*Id.* at 439:17–20.)

C. **Frain's Third Service Call: July 17**

Radujkovic arrived back at Lancaster with his Frain colleagues on July 17 to find the level sensors not working yet again. (Trial Tr. vol. 4-A, 585:14–18.) Additionally, Radujkovic recognized that the machine leaked when the air pressure fluctuated. (*Id.* at 587:6–7.) The air pressure became an issue because, during the day, Lancaster ran its own machines, and there just was not enough air pressure for all the equipment in the building. (*Id.* at 587:9–17; vol. 4-B, 653:3–25.) The Prodo-Pak, for its part, used a lot of air. (Trial Tr. vol. 4-A, 588:19–20.) With its introduction, Lancaster needed a bigger air compressor. (*Id.* at 588:21–22.) Frain made do and worked with the one, undersized compressor by reducing the air usage on other machines to compensate. (*Id.* at 588:2–14.) Unfortunately, the air compressor was not the only overwhelmed piece of equipment; the air conditioner could not keep up either. (Trial Tr. vol. 3-A, 400:10–11.) The drink mix was heated to 190 degrees as it

was produced and it created so much condensation that the air conditioner's drainage system could not keep up, causing water to fall out of the unit. (*Id.* at 400:12–14.)

Overcoming the odds once again, Frain addressed each of these issues, again leaving the machine in good working order. (Trial Tr. vol.4-A, 446:12–20.) The Lancaster owner-manager commented that the machine ran well and was "looking favorable at this time." (*Id.* at 589:1–5.) The Frain staff agreed: "we had a record run." (Trial Tr. vol. 3-A, 445:24–25.)

## V.    The Feud between Steve's and Frain

At some point after the 14-day return window expired, Steve's spoke with Frain about sending the machine back. (Trial Tr. vol. 1-A, 56:20–21.) By then, it was too late for a return under the no-questions-asked policy. (*Id.* at 56:23.) The parties also discussed repairs under the 180-day limited warranty for parts. (*Id.* at 57:2–4.) Frain informed Steve's that another return service trip would cost them because Steve's need for repair was triggered by Steve's own misuse of the machine. (*Id.* at 57:4–7.) Frain pointed out that, the 180-day warranty applied only to material defects in refurbished components and none of the components Frain refurbished had any. As a result, this dispute arose. Sometime thereafter, Steve's decided that the manufacturing business was not worth the risk for them because of their lack of expertise. (Trial Tr. vol. 2-B, 352:17–20.) Consequently, it retreated to its original purpose: loaning the chiller machines and selling its frozen drink mix. (*Id.* at 352:21–25.)

## CONCLUSIONS OF LAW

The parties chose the law and selected the forum in the contract and agree on it now: Illinois law governs this suit. (JX3H at 000015, ¶ 10); *Hendricks v. Novae Corp. Underwriting, Ltd*, 868 F.3d 542, 545 (7th Cir. 2017) (citing *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000) and explaining that, "[u]nder Illinois law the contract's choice-of-law clause generally controls . . ."); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777 (7th Cir. 2014) (quoting *IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 389 (2007) ("A forum selection clause in a contract is *prima facie* valid and should be enforced unless the opposing party shows that enforcement would be unreasonable under the circumstances.") (italics in original)).

In Illinois, a plaintiff must prove claims for breach of contract and statutory fraud by a preponderance of the evidence. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 2016 IL App (1st) 14-1793-U, ¶ 46, *appeal denied*, 65 N.E.3d 842 (Ill. 2016) (breach of contract); *Parkside at Kilani, LLC v. Tremont Realty Capital*, 2015 IL App (1st) 140595-U, ¶ 73 (statutory fraud); *see also Bd. of Trustees of Univ. of Illinois v. Ins. Corp. of Ireland*, 969 F.2d 329, 332 (7th Cir. 1992) (federal courts sitting in diversity apply the substantive evidentiary standard from state law). Therefore, Steve's, as the counter-plaintiff, bears the burden of proving its counterclaims by a preponderance of the evidence. First, Steve's argues that Frain breached the contract. Second, Steve's argues that Frain violated the ICFA.

For the reasons set forth below, Steve's did not meet its burden to prove either counterclaim. This entitles Frain to judgment.

## I. Breach of Contract

To prevail on its claim, Steve's must prove that: (1) a valid and enforceable contract existed; (2) Steve's substantially performed; (3) Frain breached; and (4) Steve's suffered damages. *Dual-Temp of Illinois, Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016) (citing *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (applying Illinois law)). Neither party challenges the validity or enforceability of the contract. (Dkt. 153, 27:2 Dkt. 152, 41:25.) And Frain does not allege that Steve's did not perform by not paying it. Instead, the bulk of the briefing and evidence received at trial dealt mostly with breach, the third element, so that is the focus of the Court's analysis below.

Steve's claims that Frain breached the contract because it failed to: (1) deliver a machine that fit the description agreed upon by the parties; (2) train the machine's operators; and (3) finish repairing or replacing parts under the warranty. (Counter-Pl.'s Steve's Frozen Chillers, Inc.'s Proposed Findings of Fact and Conclusions of Law, Dkt. 153, 27:5, 28:9–10.) Frain argues in response that Steve's failed to prove that Frain breached any term or that the machine did not perform as intended. (Dkt. 152, 42:30–31.) Rather, the absence of necessary processes, procedures, and personnel in place at Lancaster caused any damage suffered by Steve's. (*Id.* at 42:32–33.) Ultimately, Frain believes that Steve's problems were the result of user error and a lack of necessary processes and procedures in place. (Dkt. 152, 42:33–35.) Frain also

argues with regard to the damages Steve's seeks that Steve's failed to utilize contractual remedies and further that the contract bars any alternative, legal ones. (Dkt. 152, 43:40, 44:43.)

In construing a contract, "[a] court must initially look to the language of the contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 689–90 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 2621 (2018) (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (2007) (citation omitted)). A court's task is to interpret a contract as a whole, reading the provisions together and not separately. *Id.* (citation omitted). Should the words chosen by the parties be clear and unambiguous, they must be effectuated. *Id.* (citing *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (2004) (citation omitted)).

## A. The contract was for a purchase of a refurbished machine.

Here, the contract is unambiguous: the parties agreed to the sale of a reconditioned machine. (Trial Tr. vol. 2-A, 308:18–21.) It is no surprise then that Frain did not describe its designs as being Prodo-Pak's because Frain is in the business of fabricating old machines, not Prodo-Pak, which is an original equipment manufacturer. (*Id.* at 310:7–14.) Steve's purchased a retooled machine and, in doing so, received the machine it bargained for. (Trial Tr. vol. 2-A, 275:20–23.)

1. **The plain language of the contract states that the machine was refurbished.**

The contract starts with a "project overview" that describes the machine specifications, including the original serial number and product specifications provided by Steve's. (JX3A.) The overview opens and reads in part:

> Thank you for the opportunity to present this proposal for your acceptance on your *reconditioning and retooling project*. The Frain Group specializes in the reconditioning of packaging equipment, and therefore believe we offer the highest quality of services available. The purpose of this document is to review all equipment specifications and list the scope of work to be done to your equipment.

(JX3A at 000009) (emphasis added). So, right off the bat, the contract uses terms like "reconditioning" and "retooling." Indeed, that is Frain's specialty. The contract then continues into the "scope of work" and covers the "set to size" and other services that Frain provides. (JX3B at 000010.) The separate headings detail Frain's refurbishing process:

**Engineering**
- This work scope is as we understood your inquiry for this project.
- Start of your project and factory acceptance date will be scheduled after we receive your approval.
- Above machine will be set to form and fill a four sided seal pouch.
- Prodo Pak will be set as a 6-up machine – 6 pouches per cycle.
- Above machine will be set to automatically form 6 pouches, fill 3.6 oz. of fruit juice per pouch and seal at 30 cycles per minute.

[ . . . ]

**Mechanical Parts**
- The mechanical system will be *maintained in its present configuration*.
- Inspect all mechanical components; *repair and replace* as necessary.
- All claims chains will be cleaned, lubricated, and inspected; *replace* as necessary.

- Cam followers, linear bearings, Thomson shafts, and rod ends will be *replaced* as required.

**Pneumatic Parts**
- Pneumatic components will be tested and *repaired or replaced* as necessary.

**Electrical Parts**
- The electrical system will be *maintained in its present configuration*.
- All electrical components will be tested and *repaired or replaced* as necessary.

**Guarding**
- Guarding will be *maintained in its present configuration*; *repair* existing guards as necessary.

(JX3B at 000010 (italics added).) The contract contains no representation that the parts refurbished, repaired, or replaced by Frain would be supplied by Prodo-Pak, the original manufacturer.

That said, Frain did buy some of its parts from Prodo-Pak itself, including a knife and some switches. (Trial Tr. vol. 4-B, 635:17–21.) This is consistent with Frain's general use of industry standard parts with comparable quality to the original equipment manufacturer. (Trial Tr. vol. 4-B, 635:7–13.) Although the materials were not all Prodo-Pak, they remained identical to what Prodo-Pak might initially use. (*Id.* at 635:14–16, 637:22–23.) That is because Frain and Prodo-Pak purchase parts from the same suppliers. (Trial Tr. vol. 4-A, 593:10–11.) After all, Prodo-Pak does not make all of its own components: it buys roughly 50 percent of the parts on its machines from outside vendors. (Trial Tr. vol. 1-B, 178:7.) Some of those parts are made by suppliers while others are electrical components common to all packaging machines. (*Id.* at 178:12–22.)

### 2. The machine was not advertised as new and the customer knew that.

Frain's online advertisement for the machine, which appeared after Steve Schoenberg Googled it, does not market the product as new. (*See* PX14A.) Moreover, Schoenberg knew that it was a "used Prodo-Pak machine" because "[t]hat's what John Frain told" him. (Trial Tr. vol. 1-A, 48:15–18.) According to Schoenberg, Frain also told him that the machine was six years old. (*Id.* at 48:19–22.) That hardly qualifies as new. To the extent that Steve's claims that Frain represented otherwise during their negotiations, the contract includes a valid and enforceable merger clause. This means that the written agreement entails the complete and exclusive expression of the parties' agreement. *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 673 (7th Cir. 2015) (discussing the effects of an integration or "merger" clause in Illinois). The agreement states that:

> **ENTIRE AGREEMENT/MODIFICATIONS.** Buyer acknowledges that these Terms and Conditions of Sale, Seller's invoice and Project Acceptance Letter are intended by the parties to be a complete and exclusive agreement, that these Terms and Conditions of Sale, the invoice and Project Acceptance Letter supersede all prior agreements, proposals, descriptions, ratings and quotes, written or oral. Buyer acknowledges that any descriptions or representations related to the Equipment not contained in the invoice or in the Project Acceptance Letter are not valid or enforceable against seller. No course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term. ANY VARIATION FROM THE TERMS AND CONDITIONS OF SALE AND SELLER'S INVOIVE CONTAINED IN BUYER'S ACCEPTANCE OR PURCHASE ORDER SHALL NOT CONSTITUE A COUNTER OFFER OR MODIFICATION OR BE VALID OR ENFORCEABLE AGAINST SELLER UNLESS SIGNED BY AN AUTHORIZED AGENT OF THE SELLER. These Terms and Conditions of Sale can be modified only by a writing signed by an authorized agent of the Seller.

(JX3F at 000015) (emphasis in original). The contract speaks for itself: only the seller could modify it. That never happened, leaving intact the original intent and understanding of the parties memorialized in the contract: this was a used machine.

### B.     Frain's fulfilled its obligation to train under the contract.

Frain correctly asserts that no machine operator testified that Frain did not train him or her. (*Id.* at 42:34.) More importantly, the evidence shows that Frain went above and beyond to train anybody it could. Under the contract, Frain agreed to provide training to Steve's machine operators. (Trial Tr. vol. 2-A, 312:14–24.) There is a section called startup & training, which the customer normally signs to accept the additional service. It states, in part, that:

> It has been our experience over the past 29 years that our customers get into production faster when our technicians are on site for equipment startup and training of your people. That is why we strongly recommend that the technicians that worked on the machine be there for startup and training.
>
> [ . . . ]
>
> Please sign below if you would like to accept startup and training on your equipment.

(JX3H at 000018.) While Steve Schoenberg never signed this document, he nonetheless contends that this document explains and describes the training and performance Frain was obligated to provide. (Trial Tr. vol. 4-B; 681:4–22.)

Steve's also concedes that the parties agreed to startup and training because Steve's paid for it. (Trial Tr. vol. 4-B, 679:19–682:10); PX1C.) An invoice for these services, incorporated into the contract, shows that Frain estimated it would charge Steve's $12,950 for "[s]tartup and training at your facility for 60 hours and 2

technicians." (JX2 at 000007.) In addition, there is another invoice for a service estimate, which estimates the service to be "1 Mechanical (40hrs) & 1 Programming Technician (20hrs)." (PX1B.) The estimate also states that "[m]achinery must be in place, removed from skid and hooked to all utilities." In all these documents, there is no description of what start-up and training entails, only the time allotted. (Trial Tr. vol. 4-B, 682:3–10.)

Regardless, Frain trained Steve's operators. While the training did not go smoothly, it was undoubtedly provided. For example, Jadran Radujkovic traveled to Lancaster to train the machine's operators on July 5. (Trial Tr. vol. 2-B, 378:3.) His task was made difficult, however, because Lancaster had no real technical or electrical support staff to train. (Trial Tr. vol. 3-A, 442:15–16.) There were two technicians on staff, but both were preoccupied with running the plant and not the Prodo-Pak machine. (*Id.* at 442:17–22.) Additionally, as Radujkovic tried to train the operators that day, the personnel kept changing and different came and went. (Trial Tr. vol. 4-A, 550:6–10.)

On July 9, Radujkovic trained the day shift mechanic on how to put the film through the machine. (*Id.* at 566:6–7.) But explaining this to the mechanic was hard due to his other responsibilities in the plant. (*Id.* at 566:9–11.) Indeed, every time Frain visited the facility, Lancaster was running full production, and only staffing enough people to run their own machines. (*Id.* at 382:1–2.) Lancaster machines clearly took precedence over Steve's refurbished one. (Trial Tr. vol. 4-A, 566:13–16; Trial Tr. vol. 4-B, 656:5–9.) As one Frain employee put it, "[y]ou can't train them when

they're not there." (*Id.* at 656:18–19.) Accordingly, the Court rejects Steve's assertion that Frain breached the contract by not training the machine operators.

### C.    Rather than Frain breaching, Steve's failed to properly install the machine and then misused it.

The contract's terms and conditions of sale make the buyer responsible for certain tasks. For instance, the contract states:

> **BUYER'S RESPONSIBILITY AND INDEMNITY.** *Buyer shall be solely responsible for ensuring that the Equipment purchased from Seller is installed and operated in a proper and safe manner.* Buyer acknowledges that it may have to install or change guards, safeties, warnings labels, and other components to ensure that the Equipment will operate safely and will conform to all laws, regulations, ordinances, codes, Insurance requirements and industry standards.

(JX3F at 000015, ¶ 8) (emphasis added). And in another section, Frain's standard terms and conditions, the contract also reads:

> Production machine rates, when given, are based upon the machinery *being properly maintained and operated under original design operating conditions*, using specified packaging materials, *with competent trained operators and maintenance personnel*, and upon the Frain Group's analysis and understanding of the production conditions. Production estimates are approximations an are not guaranteed.
>
> Start-up and training on the machinery by a Frain Group technician is recommended.

(JX3D at 000012 (emphasis added).) The written agreement leaves no room for doubt that Steve's was responsible for installation and that any issue arising out of that process or Steve's use of the machine was its own problem. The trial testimony makes clear that the processes and environment at Lancaster caused the machine to break down, not Frain's refurbished parts. (*See, e.g.,* Trial Tr. vol. 1-A, 42:35.)

**D.** **Even if Frain breached, Steve's failed to invoke remedies under the contract, entitling it to no damages.**

Steve's never submitted a valid warranty claim. And even if it did, Frain repaired and replaced some components and the ones it did not were excluded because of their normal wear. The contract included a 180-day limited warranty on parts and a 14-day right of return. (Trial Tr. vol. 2-A, 310:18–22.) By assenting to this term, Frain agreed to repair or replace any damaged or worn-out parts. (*Id.* at 276:6–12, 288:1–8.) The contract stated, in part:

> **LIMITED WARRANTY.** Seller hereby warrants any components refurbished by Seller will be free from material defects for a period of 180 days from the date of machine acceptance at the seller's facility (the "Warranty Period"). In the event of a valid warranty claim, Seller shall have the option either to repair the defective component or provide Buyer with a replacement component at Seller's expense. In order for a warranty claim to be valid, the claim must be made in writing within the Warranty Period. Normal wear parts that need to be repaired or replaced as a consequence of operating the Equipment are excluded from this Limited Warranty and are the sole responsibility of Buyer . . .

> [ . . . ]

> **14 DAY RIGHT OF RETURN.** Seller hereby provides Buyer with FRAIN INDUSTRIES's 14 day unconditional right of return. Buyer may return the Equipment to Seller within 14 days of delivery of the Equipment to Buyer, in the same condition as the Equipment was in when loaded on to Buyer's trailer, secured to the original skidding provided by Seller or if not skidded by Seller, then created, with costs of shipping prepaid by Buyer, for a full refund of the purchase price excluding (i) any payment made to hold the Equipment which payment will be refunded in the form of a merchandise credit to be used for future purchases made within 12 months from the end of this 14 day unconditional right of return period, (ii) set up charges and (iii) any additional charges such as change orders not included in the original invoice. Seller's 14 day right of return is in lieu of any Limited Warranty or other claim against Seller.

(JX3F at 000014.) The problem for Steve's is that it never requested replacement parts under the warranty, nor did it send the machine back under the 14-day no-questions-asked return policy. (Trial Tr. vol. 2-A, 310:23–311:9; vol. 1-A, 90:1–13.) Although Steve's argues that a July 7 email it sent to Frain constituted a warranty claim, it merely notified Frain of ongoing problems, and failed to adhere to the process laid out in the contract. (JX4-B.)

Regardless, Frain responded and sent its employees to repair and replace a handful of the machine's components. First, Frain took the filler nozzle assembly back to its facility and fabricated a part that would make it easier for the Lancaster technicians to change the O-rings. (Trial Tr. vol. 2-B, 378:15–-382:14; vol. 4-A, 577:6–578:1.) This did not mean the machine was defective; rather, it meant the operators did not know what they were doing. (*Id.*) Second, Frain replaced all of the slitter blades at no cost to the customer or operator. (Trial Tr. vol. 3-A, 427:15–22; vol. 4-A, 571:2–14.) Third, Frain replaced some parts due to normal wear and tear or, like the O-rings, because of operator error. (Trial Tr. vol. 3-A, 423:10–12, 444:6–11, 459:13–14; vol. 4-A, 569:1; vol. 4-B, 648:12–649:3, 650:19–22.) Frain did not charge Steve's for any of these repaired or replaced parts. (CDX6; CDX7; CDX8.) No component malfunctioned because of a faulty design or refurbishing. Therefore, the Court declines to adopt Steve's view that Frain did not honor the warranty.

In conclusion, Frain did not breach the contract. Instead, Steve's misuse of the machine caused its malfunction. Although irrelevant to the breach, it is obvious that the misuse was motivated by Steve's need to fulfill the New York City contract.

## II.     Illinois Consumer Fraud Act Claim

Steve's reasons Frain violated the ICFA because it deceived Steve's by: (1) attaching a sticker to the machine that displayed the original manufacturer's logo; (2) refurbishing the machine with dissimilar parts unlike those found in a Prodo-Pak machine; and (3) telling it that the machine was six-years-old when it was 18-years-old. (Dkt. 153, 29:14, 29:18, 29:20.)

To succeed on a deceptive-practice claim under the ICFA, a plaintiff must show that the: (1) defendant deceptively acted or practiced; (2) defendant intended that the plaintiff rely on the deception; (3) deception occurred in the course of trade and commerce; (4) plaintiff suffered actual damage; and (5) deception proximately caused the damage. *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1000–01 (7th Cir. 2018) (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)); *see Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (discussing the damage and causation elements, in addition to the others required to state a claim under the Act). Frain does not contest the third element. (Dkt. 152, 46:49.) Instead, Frain argues that neither the sticker, the machine's age, nor the machine's parts constitute deceptive acts or practices under the Act.

Courts must view an allegation of deception "in light of *all the information* available to plaintiffs." *Newman*, 885 F.3d at 1001 (quoting *Phillips v. DePaul Univ.*, 2014 IL App (1st) 122817, ¶ 44 (emphasis in original)). Deception lacks where a seller alerts a buyer to the possibility of the alleged harm. *Id.* (citing *Davis*, 396 F.3d at 883); *see Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir.

2018) (citing *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 164 (2002) (holding that those who "know the truth" have no claim under the ICFA)). Finally, a plaintiff must show that the defendant intended for it to rely on the information or action alleged to be misleading. *Newman*, 885 F.3d at 1001 (citing *Cuculich v. Thomson Consumer Elec., Inc.*, 739 N.E.2d 934 (2000)). In this case, because none of Frain's actions were deceptive, Steve's ICFA counterclaim fails.

## A.   The Prodo-Pak sticker is not a deceptive act or practice.

First, Frain argues that Steve's viewed and purchased the machine without the sticker on it, so it could not have intended to or actually deceived Steve's. (Dkt. 152, 48:63.) While placing a sticker on a machine might generally constitute a deceptive act, here there was no sticker on the machine when David Schoenberg and Mark Thompson visited Frain on May 29. (Trial Tr. vol. 2-A, 315:7–13.) But when David Schoenberg returned for the Factory Acceptance Test on June 30, he saw the sticker bearing the Prodo-Pak logo. (*Id.* at 315:14–24.) This distinction is meaningful: Steve's observed the machine and agreed to buy it before the logo could have changed the calculus. Steve's knew what it was bargaining for, so it could not have been deceived.

The timeline is reason enough to deny the claim, but there is more. To be sure, Frain attaches the corresponding company logos to its machines at the end of projects; Prodo-Pak, however, does not have this practice. (Trial Tr. vol. 1-B, 157:19–24; vol. 2-A, 315:7–13.) The Court can assume without deciding that Frain intends its customers to rely on decals to identify particular products, considering that Steve Schoenberg himself found the machine online because of a Prodo-Pak logo. (Trial Tr. vol. 1-

A, 48:12–14.) But the deploy of a marketing strategy—standing alone—is not deceiving. Steve's claims the sticker by itself conveyed that the machine was a Prodo-Pak with Prodo-Pak parts. That is a step too far. Importing that significant of a message into a decal would not just defy logic, it would disregard the contract. As detailed above, the contract itself contains no provision explaining that the parts refurbished, repaired, or replaced by Frain would be Prodo-Pak parts. Even so, some were. (Trial Tr. vol. 4-B, 635:17–21.) But, of course, not all, because not even Prodo-Pak manufactures all of the components it uses to build its machines. (Trial Tr. vol. 1-B, 178:7.) Steve's was aware that it was purchasing a Prodo-Pak machine with reconditioned parts. There was no deception, let alone deception causing actual damage to Steve's.

## B.  The machine's age did not cause actual damage to Steve's.

Second, Frain contends that Steve's failed to prove that it would have acted differently had it known that the machine was more than six-years-old. (*Id.* at 47:56.) It also argues that John Frain denied making such a statement, and even if he did, the contract contains a merger clause. (*Id.* at 47:57.) Finally, Frain argues that Steve's failed to prove that the machine's age affected its intended function. (*Id.* at 47:57.) As an initial matter, the contract lacks any reference to the machine's age, and it represents the complete and exclusive agreement between the parties. *Cf. W. Bend Mut. Ins. Co.*, 794 F.3d at 673.

Delving further and assuming for the sake of argument that, but for being told the machine was six-years-old, Steve's would not have bought it, Steve's still failed to prove that it incurred actual damage resulting from the allegedly deceptive

statement. Prodo-Pak originally manufactured the model that Frain was selling in 1997, making it 18-years-old at the time of purchase. (Trial Tr. vol. 1-B, 146:12–14.) Supposing that John Frain did tell Steve Schoenberg that the machine was actually six-years-old, Steve's fails to show if and how the age of the machine affected its performance, causing any damages whatsoever. Frain refurbishes up to forty-year-old machines. (Trial Tr. vol. 2-A, 305:2–12.) The age of the machine is, in fact, irrelevant for Frain's purposes, so long as it can recondition and support the machine. (*Id.*) If it can do that, it is a "good running piece of equipment." (*Id.*) There is simply no evidence that the age of the machine caused its problems. And if the machine's age really concerned Steve's, it could have looked it up by the serial number. (*Id.* at 307:14–19.) The machine, even at 18-years-old, did not damage Steve's.

## C. The machine's parts did not deceive Steve's, nor did they cause Steve's actual damage.

Third, Frain asserts that it never represented that it would only repair and replace components with the original ones from the manufacturer. (Trial Tr. vol. 1-A, 47:59.) This conclusion is in step with the contract. Again, as discussed above, the contract does not include a term describing the parts to be refurbished, repaired, or replaced by Frain. And if the contract does not define the parts at all, it cannot go one step further and say that those parts would in fact be Prodo-Pak parts. Frain retooled the machine consistent with its general practice of selecting industry standard parts of comparable quality to the original equipment manufacturer. (Trial Tr. vol. 4-B, 635:7–13.) Some parts were Prodo-Pak (*Id.* at 635:17–21), while others were from the same vendors Prodo-Pak buys from (Trial Tr. vol. 4-A, 593:10–11), and still others

were electrical components used in all of these types of machines. (Trial Tr. vol. 1-B, 178:12–22.) Steve's fails to explain where and when Frain allegedly deceived it by offering exclusively Prodo-Pak parts. Such a claim is contradicted by the contract and has no support in the record. Even if it did, the parts did not cause Steve's actual damage; instead; Steve's improper installation and repeated misuse of the machine did.

## CONCLUSION

Based on the foregoing factual findings and legal conclusions, Steve's did not carry its burden on either its breach of contract or ICFA counterclaim. Therefore, the Court enters judgment for Frain.

Virginia M. Kendall
United States District Judge

Date: September 28, 2018